IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2025 Session

## HANNAH DEVELOPMENT, LLC v. MAVERICK GENERAL CONTRACTORS, LLC ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 83CC1-2024-CV-682  Joe Thompson, Judge**

_____

**No. M2024-01592-COA-R3-CV**

_____

A Tennessee residential homebuilder alleged that a Floridian general contractor and its principal fraudulently disguised the painting of fencing at the principal's personal residence as a legitimate business expense on a fraudulent invoice submitted to and paid by the Tennessee company. The company brought a tort suit in Tennessee. The trial court granted the Defendants' motion to dismiss for lack of personal jurisdiction. We conclude that the homebuilder's allegations and the Defendants' contacts with Tennessee are sufficient for specific personal jurisdiction, and that exercising personal jurisdiction would not violate the Due Process Clause. Accordingly, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Andrew J. Pulliam, Nashville, Tennessee, for the appellant, Hannah Development, LLC.

Joshua J. Phillips, Gallatin, Tennessee, for the appellees, Maverick General Contractors, LLC, and Brent McDowell.

## OPINION

### I.

Appellant Hannah Development, LLC (Hannah), is a member-managed limited liability company that builds residential homes in multiple states, including Tennessee and Florida. Hannah established its headquarters and sole operating office at 100 Commerce

Drive, Suite A, Hendersonville, Tennessee 37075. Hannah is registered with both the Tennessee Secretary of State's office and the Florida Secretary of State's office using the same Hendersonville, Tennessee, address as its "principal address" and "mailing address." Hannah alleges that its members complete all contracting, design, payroll, management, and other essential functions from within the company's Hendersonville, Tennessee, office. Hannah's members opened a business account at Sumner Bank & Trust in Sumner County, Tennessee, for the purposes of facilitating all necessary monetary disbursements.

In 2022, Hannah began work on two homebuilding projects in Florida. First, Hannah designed a custom home to be built at 19 Saint Tropez Court in Miramar Beach, Florida (the "St. Tropez Project"). Hannah completed this project in 2023. Second, Hannah acted as an agent for a Tennessee couple seeking to build a house at 276 Clareon Drive in Inlet Beach, Florida (the "Clareon Project"). Hannah completed this project in 2024. Though the record lacks copies of any advertisements for these projects, the parties recognize that Hannah obtained bids for these projects from qualified Floridian general contractors.

Appellee Brent McDowell owns and principally operates Appellee Maverick General Contractors, LLC ("Maverick"), which is a Florida limited liability company. Acting on Maverick's behalf, Mr. McDowell submitted bids for Hannah's projects. The parties disagree on some of the details concerning the bidding process. Mr. McDowell swore in a declaration that one of Hannah's members personally visited him in Florida to negotiate at least one of the bid contracts. Hannah, however, denies that it ever sent a representative to meet Mr. McDowell. Instead, Hannah points to a series of emails sent by Mr. McDowell to Hannah's Tennessee-based representatives wherein Mr. McDowell attached copies of what appear to be bid contracts that he personally drafted for Hannah's consideration.

Each of Maverick's bid contracts is two pages long and is entitled "Construction Contract Agreement." The contracts feature the name "Maverick General Contractors LLC" in the header and Mr. McDowell's signature at the end of the document. Each contract briefly describes the work that Mr. McDowell and his company would perform, the minimum funding necessary to begin work, the company's obligation to "comply to all FL building codes" and worker's compensation requirements, the provision of Builder's Risk Insurance by Maverick, alongside other general details about the length of the contracts and the terms. Neither contract includes a choice of law provision or a venue selection clause. Mr. McDowell and Maverick also appended quote sheets to both contracts that represented their reasonable forecast regarding how much funding would be necessary to complete each project. Regarding these attached quotes, the St. Tropez project quote describes Hannah as being located at "LOT 17 SAINT TROPEZ" in Florida. However, the later-executed Clareon Project quote describes Hannah as being located at "100 Commerce Drive, Suite A, Hendersonville, Tennessee 37075." Hannah accepted Maverick's bids.

Construction proceeded on both projects shortly thereafter. Regarding the construction process, Hannah alleges that it created and finalized plans for each project in Hendersonville and sent the finalized plans to Maverick and Mr. McDowell. Then, Mr. McDowell worked alongside other subcontractors to complete the physical work at each site. At Mr. McDowell's request, Hannah regularly wired funds from its bank account in Sumner County, Tennessee, typically in the form of $50,000 draws, to pay for things like subcontractor compensation and material acquisition. In terms of construction progress, Mr. McDowell regularly sent written explanations or photographic proof of work being completed, allowing Hannah to review and respond with any necessary changes or questions. Despite Hannah playing a significant role in steering the parties' relationship, it appears that Maverick controlled some aspects of the relationship as well, including some accounting matters. In one email in particular, Misty Pyle, one of Hannah's members, asked Mr. McDowell if Hannah could "please do the billing differently" and to send invoices to a general email account. Mr. McDowell apparently rejected Ms. Pyle's request, writing: "[T]his is the way I am going to do it moving forward, also I will be sending copies of the checks too. I am going to send to you and Dusty only" instead of the general email account. In the aggregate, the record contains hundreds of email communications between Hannah's members and Mr. McDowell regarding these two projects. Almost every time that a Hannah representative sent an email to Mr. McDowell or responded to a communication from him, said representative signed the email with a corporate signature block that includes the company's corporate address in Hendersonville, Tennessee.

Mr. McDowell and Maverick looped in many subcontractors while completing work on these two projects. The record contains many quotations and contracts from various vendors, including several Floridian subcontractors. However, the record also includes documents related to a company called Ferguson Enterprises, LLC, which is based in Nashville, Tennessee. Though the record does not confirm whether one of Hannah's representatives personally contacted Ferguson Enterprises or if instead Mr. McDowell and Maverick initiated contact, quote sheets from Ferguson Enterprises indicate that appliances and fixtures were sold to "Hannah Custom Homes" before being immediately shipped to Florida.[1]

The dispute that animates this appeal concerns Maverick and Mr. McDowell's interactions with one of their subcontractors, specifically a man named Freddy Pineda. Mr. Pineda is a painter by trade and owns a company called CEP Construction, Inc. Hannah alleges that Mr. McDowell instructed Mr. Pineda to paint a series of fences located at Mr. McDowell's personal residence and then fraudulently charge the costs of painting those fences to Hannah by masquerading them as legitimate business expenses associated with

---

[1] The exact status of "Hannah Custom Homes vis-à-vis Hannah Development, LLC," is not made clear in the record, but Ms. Pyle's email signature block lists "Hannah Custom Homes" alongside several other similarly named limited liability companies.

the Clareon Project.

Mr. Pineda swore a declaration in this case wherein he corroborated Hannah's allegations. Mr. Pineda averred that

> [d]uring that Clareon Project, pursuant to McDowell's instructions, I painted the fence at his home and charged the $10,000 for that work to the Clareon Project. At the time, CEP was under the impression that MGC and Hannah were partners on the building of the Clareon Project. Thus, when MGC told me to invoice the fence painting at the McDowell home to the Clareon Project, I did not question it. When I was later told that both companies were not partners on that project, I realized what had happened and I informed Hannah of the work on Mr. McDowell's home fence and provided Hannah with the invoice, showing that such work was done on Mr. McDowell's home, which Mr. McDowell had failed to do.
>
> . . .
>
> McDowell told CEP to charge the fence painting at his home to the Clareon Project even though that painting work was not related to the Clareon Project at all. Following his direction, CEP then invoiced the $10,000.00 for painting McDowell's home fence to McDowell on August 3, 2023 (Invoice #2209). That invoice is attached to Dusty Hannah's Declaration as Exhibit E. CEP put in its invoice that the painting was for the Clareon Project and did so because McDowell told me to do that. CEP charged the $10,000.00 amount to the Clareon Project because McDowell told me to do so.
>
> . . . .
>
> In March 2024, Hannah asked me about the difference between the $30,000.00 amount bid by CEP for all painting on the Clareon Project and the $40,000.00 charged for painting on that project. It was at this time I was told that MGC and Hannah were not partners on that project and I realized what had happened. I told Dusty Hannah that the extra $10,000.00 was for painting the fence at McDowell's home and that McDowell told me to charge that extra $10,000.00 to the Clareon Project. I provided Hannah the invoice, showing that such work was done on Mr. McDowell's home.

Consistent with Mr. Pineda's recollection, Hannah alleges that it received an invoice from Mr. McDowell via email that included this allegedly fraudulent charge, that it failed to discover the disguised charge upon initially reviewing the invoice, and that it subsequently disbursed $40,000 to Maverick and Mr. McDowell from its bank account in Tennessee instead of the $30,000 that CEP originally bid for the painting work.

- 4 -

When Hannah received this information from Mr. Pineda, the company accused Mr. McDowell of wrongdoing. Specifically, Dusty Hannah, who is Hannah's owner as well as a member, wrote to Mr. McDowell,

I couldn't figure out why it was taking Freddy so long to give a simple answer on why Connor was overbilled $10,000. Seemed like a simple request, but now I understand why. After letting him know that we would be deducting the $10,000 from his St. Tropez invoice, he informed me that you requested him to make the bill out for our Clareon job, but that the work for the $10,000 was completed at your personal residence. Given that the work was not on the Clareon Job, please refund us the $10k asap that was overpaid. I understand that you may have had him complete work at the other project but billed our project to save you cost. Even if that was the case, we should not have had to pay for the other project.

Finally, I also want to make sure that this did not happen regarding any other sub/suppliers on the Clareon or St Tropez job. So, please refund us the $10k that was overpaid as soon as possible and let us know whether overpayment was done regarding any of the other subcontractors/suppliers on the Clareon or St Tropez jobs.

Thanks.

**Dusty Hannah**
Owner/Operator
**Hannah Custom Homes, LLC**
100 Commerce Drive
Hendersonville, TN 37075
[phone number omitted]

Mr. McDowell responded to this email, denying Mr. Hannah's fraud implication:

Dusty,

I appreciate you returning my phone call yesterday afternoon. As we spoke about CEP did not paint my home and it was completed in the Spring of 2022. With that being said we do have many other projects from commercial and residential that they are painting and no telling what [bids], contract amount or punch outs may have been billed to all jobs of CEP Painting. They do good work but the bidding and billing is not that great at times. As I said yesterday and the past two year[s] if there is any credit due we are happy to apply! I do not like or approve of your email and Jeff[']s last phone call. I

fee[l] like we did a very good job with the 50k flat[] fee and the [homes]. Hoa stuff in St Trop[e]z should have been done by you guys and your HOA! We built the home per code, per approved samples and spec[s] provided.

I called Freddy about your email and have not heard back from him. I also spoke with Mr. Connor regarding their home yesterday and he brought up the final amount due and whom he should pay last 20k ap[p]rox it to[]. I will be in touch about a few items as well that are not lined up. Please provide us an update on the outstanding invoice from the rental equipment we billed you guys under our contract agreement in St Trop[e]z. I am requesting a copy of the contract agreement with the amount paid to the cabinets company you used with a copy of their Florida General Liability Insurance and Florida Workers Comp Policy on 19 St. Trop[e]z and 167 Clar[e]on.

Thank you,

Brent McDowell
Owner & General Contractor
Maverick General Contractors, LLC
[phone numbers omitted]

Having found no relief through Maverick and Mr. McDowell (the Defendants), Hannah sued them in Sumner County General Sessions Court. Hannah demanded that they answer for a "[Tennessee Consumer Protection Act (TCPA)] violation, fraud, theft, intentional misrepresentation, conversion, and breach of contract" stemming from the fence painting incident. In advance of a hearing, Hannah paid to fly Mr. Pineda to Tennessee to testify against the Defendants, but the Defendants obtained a continuance after making a special appearance to contest the validity of personal jurisdiction. In addition to urging the court to dismiss Hannah's lawsuit for lack of personal jurisdiction, Maverick and Mr. McDowell also raised a defense under the doctrine of *forum non conveniens*.[2] After obtaining their continuance, Maverick and Mr. McDowell removed Hannah's lawsuit to Sumner County Circuit Court.

Hannah filed a first amended complaint in the trial court. Notably, Hannah abandoned its breach of contract claim while retaining its tort claims. It identified in its

---

[2] Whereas the lack of personal jurisdiction presents overriding concerns about a court's ability to hear a particular controversy, "[*f*]orum non conveniens deals with the discretionary power of the court to decline to exercise a possessed jurisdiction whenever, because of varying factors, it appears the controversy may be more suitable or conveniently tried elsewhere." *Luna v. Sherwood*, 208 S.W.3d 403, 405 (Tenn. Ct. App. 2006) (footnote omitted); *see also Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996) (distinguishing between personal jurisdiction, which, like subject matter jurisdiction, "is generally defined by the constitution or statute and conferred by the authority that organizes the courts," and venue, which "is a concept based on privilege of and convenience to the parties").

complaint a great deal of the interactions that Maverick and McDowell had with Tennessee generally and Hannah specifically.

Maverick and Mr. McDowell renewed their motion to dismiss for lack of personal jurisdiction and re-raised their *forum non conveniens* defense. Despite Hannah having abandoned its breach of contract claim, the Defendants characterized Hannah's entire lawsuit as one sounding in contract, rather than tort. Proceeding forward from that premise, the Defendants emphasized that essentially all the physical work on the St. Tropez Project and Clareon Project took place in Florida, which, they argued, undermined any suggestion that they had purposefully availed themselves of Tennessee. Maverick and Mr. McDowell also argued that it would be unfair and unreasonable for Tennessee to exercise personal jurisdiction. Additionally, the Defendants argued in the alternative that, even if Maverick could be haled into Tennessee courts, Mr. McDowell could not, as he had only been acting as Maverick's agent. Hannah responded to the Defendants' motion with a staggering number of exhibits, including among other things, hundreds of emails, numerous bank statements and wire transfer confirmations, building plans, text messages, and sworn declarations that, it alleged, demonstrated in the aggregate that Maverick and Mr. McDowell knowingly and intentionally engaged in tortious conduct aimed at Tennessee and that they injured a Tennessee domiciliary in the State of Tennessee.

The circuit court granted Maverick and Mr. McDowell's motion to dismiss for lack of personal jurisdiction without ruling on the Defendants' *forum non conveniens* defense. The circuit court concluded that the alleged misconduct did not meet two of the possible statutory hooks for exercising personal jurisdiction. Specifically, the circuit court found inapplicable both Tennessee Code Annotated section 20-2-223(a)(1), which permits state courts to exercise personal jurisdiction over nonresident defendants who "[t]ransact[] any business in this state," and Tennessee Code Annotated section 20-2-223(a)(4), which permits state courts to exercise personal jurisdiction over nonresident defendants "[c]ausing tortious injury in this state by an act or omission outside this state of the person who regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state."

Hannah appealed the dismissal of its suit. Hannah set forth the issue on appeal as "[w]hether the trial court erred by dismissing the case based on a finding that Hannah did not show a *prima facie* case that there is personal jurisdiction over Defendants in Tennessee." Alternatively, Maverick and Mr. McDowell defend the circuit court's dismissal on the basis that Hannah failed to make its prima facie case, which was the basis of the circuit court's ruling, and also on the basis of unfairness and unreasonableness under step two of personal jurisdiction analysis. Hannah replies that it satisfies both the step one and step two requirements for personal jurisdiction.

II.

This appeal requires us to consider whether the trial court erred in dismissing Hannah's lawsuit against Maverick and Mr. McDowell for lack of personal jurisdiction. Tennessee Rule of Civil Procedure 12.02(2) allows nonresident defendants like Maverick and Mr. McDowell to challenge whether the trial court has personal jurisdiction. *See Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 470 (Tenn. 2020); *see also Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 643 (Tenn. 2009) ("The Court correctly pointed out that questions regarding personal jurisdiction must be raised and decided using the procedures applicable to Tenn. R. Civ. P. 12.02(2)."). In applying this mechanism, the Tennessee Supreme Court has cautioned courts against "improperly depriving the plaintiff of its right to have its claim adjudicated on the merits." *Crouch Ry. Consulting, LLC*, 610 S.W.3d at 470-71 (citing *Gordon*, 300 S.W.3d at 644).

The Tennessee Supreme Court has explained the mode of analysis and standard of review in such cases as follows:

> A defendant may challenge the existence of personal jurisdiction by filing a motion to dismiss the complaint under Rule 12.02(2) of the Tennessee Rules of Civil Procedure. The defendant may choose to support the motion with affidavits or other evidentiary materials. If a defendant does so, the plaintiff must respond with its own affidavits or other evidentiary materials. *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015); *Gordon*, 300 S.W.3d at 644. However, a Rule 12.02(2) motion is not converted to one for summary judgment when the parties submit matters outside the pleadings. *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn. 2013); *Gordon*, 300 S.W.3d at 644.

> The plaintiff bears the burden—albeit not a heavy one—of establishing that the trial court may properly exercise personal jurisdiction over a defendant. *First Cmty. Bank*, 489 S.W.3d at 382; *Gordon*, 300 S.W.3d at 643. When a defendant supports its Rule 12.02(2) motion with affidavits or other evidentiary materials, the burden is on the plaintiff to make a prima facie showing of personal jurisdiction over the defendant through its complaint and affidavits or other evidentiary materials. To make a prima facie showing of personal jurisdiction under Tennessee law, the factual allegations in the plaintiff's complaint, affidavits, and other evidentiary materials must establish sufficient contacts between the defendant and Tennessee with reasonable particularity. *First Cmty. Bank*, 489 S.W.3d at 383.

> In evaluating whether the plaintiff has made a prima facie showing, the trial court must accept as true the allegations in the plaintiff's complaint and supporting papers and must resolve all factual disputes in the plaintiff's

favor. *Sumatra*, 403 S.W.3d [726,] 739 [Tenn. 2013]. However, the court is not obligated to accept as true allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or farfetched inferences. *First Cmty. Bank*, 489 S.W.3d at 382. Nevertheless, the court should proceed carefully and cautiously to avoid improperly depriving the plaintiff of its right to have its claim adjudicated on the merits. *Gordon*, 300 S.W.3d at 644.

A trial court's decision regarding the validity of personal jurisdiction over a defendant presents a question of law. We therefore conduct a de novo review of the trial court's decision with no presumption of correctness. *First Cmty. Bank*, 489 S.W.3d at 382; *Gordon*, 300 S.W.3d at 645. In other words, in this appeal, we conduct the same evaluation of [the] complaint and the parties' affidavits and supporting papers relating to [the defendant's] Rule 12.02(2) motion as the trial court.

*Crouch Ry. Consulting, LLC*, 610 S.W.3d at 470-71.

III.

The central issue presented on appeal in the present case is whether Hannah can constitutionally and fairly compel Maverick and Mr. McDowell to defend against its suit in a Tennessee court. The parties have thoughtful disagreements about this issue. Before we examine the contested ground between them, it is important to consider the contours of personal jurisdiction and the framework set forth by the Tennessee Supreme Court for analyzing such issues.

The Fourteenth Amendment to the United States Constitution provides in part that states like Tennessee cannot "deprive any person of life, liberty, or property, without due process of law."[3] U.S. Const. Amend XIV, § 1. Traditionally, "a court simply could not exercise *in personam* jurisdiction over a nonresident who had not been personally served with process in the forum" unless the nonresident, otherwise, consented to the action. *Burnham v. Superior Ct. of Cali., County of Marin*, 495 U.S. 604, 616-18 (1990) (explaining historical evolution of personal jurisdiction principles); *see also Crouch*, 610

---

[3] During oral argument, the Defendants clarified that they present no argument in this case that the Tennessee Constitution provides any greater protection to them in this area than the United States Constitution. *See Gordon*, 300 S.W.3d at 646 ("Tennessee courts have generally held that the due process requirements of the Constitution of Tennessee are co-extensive with those of the United States Constitution."). Accordingly, we tailor our focus upon the general personal jurisdiction requirements imposed by the Fourteenth Amendment to the United States Constitution as they have been previously explained by state and federal courts. *See, e.g., id.* ("We have also drawn helpful guidance from the decisions of the federal courts, particularly the United States Supreme Court, with regard to the application of due process principles to the exercise of personal jurisdiction over . . . nonresident defendants.").

S.W.3d at 471 (tracing due process principles "back to the nineteenth century" and specifically the United States Supreme Court's decision in *Pennoyer v. Neff*, 95 U.S. 714 (1877)). In 1945, however, the United States Supreme Court "eschewed the historical view that a defendant's presence within the territorial jurisdiction of a court is a prerequisite to the court's authority to render a valid judgment" against him, *Crouch*, 610 S.W.3d at 471, and shifted the focus instead to whether the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *id.* at 471-72 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see also NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 741 (calling *International Shoe* "[t]he United States Supreme Court's seminal modern personal jurisdiction case").

Two broad categories of personal jurisdiction exist within the *International Shoe* paradigm: general personal jurisdiction and specific personal jurisdiction. *First Cmty. Bank, N.A.*, 489 S.W.3d at 388. The first category is more often called "general jurisdiction" and is premised on substantial forum-related activity by the defendant that is sufficiently continuous and systematic to treat the defendant as being "essentially at home" in the forum state. *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 358 (2021) (referring to the same as "all-purpose" jurisdiction because a state with general jurisdiction over a nonresident defendant can hear cases "concern[ing] events and conduct anywhere in the world"); *see Gordon*, 300 S.W.3d at 647-48 (collecting cases). This level of connectivity is usually established when a business either incorporates or operates its principal place of business in the forum state. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Hannah noted at oral argument that it was not asserting that either Mr. McDowell or Maverick had established such a firm connection with Tennessee, meaning Hannah is instead placing its focus on asserting "specific jurisdiction." *See First Cmty. Bank, N.A.*, 489 S.W.3d at 388.

"Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of" or relates to "those contacts." *Id.* (quoting *N.V. Sumatra Tobacco Trading Co.*, 403 S.W.3d at 744); *Ford Motor Co.*, 592 U.S. at 359 ("[W]e have often stated" that the causation component of specific jurisdiction analysis requires that the plaintiff's lawsuit "'must arise out of or relate to the defendant's contacts' with the forum" (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cali., San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (citation modified))). The existence of some contacts between the defendant and the forum state "has been the crux of personal jurisdiction in America ever since *International Shoe* was decided." *NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 741-42. If some contacts exist between the defendant and Tennessee, the question next becomes whether "(1) they show purposeful availment of the forum state, and (2) [whether] the plaintiff's claim either 'arise[s] out of or relate[s] to' to defendant's contacts with the forum." *Baskin*, 676 S.W.3d at 575 (quoting *Ford Motor Co.*, 592 U.S. at 359 (citation modified)).

This court has explained that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hibdon v. Grabowski*, 195 S.W.3d 48, 71 (Tenn. Ct. App. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). That a defendant has purposefully availed himself or herself of Tennessee is not independently sufficient to create specific personal jurisdiction, as the plaintiff must also demonstrate that his or her lawsuit somehow spawned out of the defendant's purposeful availment. A plaintiff may show that his or her lawsuit "arises out of" the defendant's contacts by demonstrating either "a causal connection between the defendant's in-state activities and the plaintiff's claim" or that his or her lawsuit is "relate[d] to" the defendant's contacts with Tennessee "without [needing] a causal nexus between them and the plaintiff's claim." *Baskin*, 676 S.W.3d at 575 (citing *Ford Motor Co.*, 592 U.S. at 362); *see also* Amy L. Moore, *Sweeping General Jurisdiction Under the Specific Jurisdiction Rug*: *A Doctrinal Map of the Contraction and Expansion of Personal Jurisdiction as Told by* Ford, 93 Miss. L.J. 665, 670 (2024) (emphasizing that the relational test of the United States Supreme Court "is disjunctive: contacts may prompt litigation by causally creating them *or* contacts may merely relate to the litigation to be sufficient"). All these inquiries fit within what the Tennessee Supreme Court has deemed to be the first step of the specific personal jurisdiction analysis. *First Cmty. Bank, N.A.*, 489 S.W.3d at 388 (instructing courts "to analyze first whether the defendant's activities in the state that gave rise to the cause of action constitute sufficient minimum contacts with the forum state to support specific jurisdiction" (citing *International Shoe Co.*, 326 U.S. at 316)).

However, even where sufficient contacts exist and the plaintiff's lawsuit is either causally linked or otherwise related to those contacts, the State of Tennessee cannot exercise specific personal jurisdiction unless doing so would be fair and reasonable under the circumstances. *Baskin*, 676 S.W.3d at 569 ("If a plaintiff has made a prima facie showing of a defendant's minimum contacts, the defendant may nevertheless 'present a compelling case' that the exercise of specific jurisdiction would be unfair or unreasonable." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). As noted in the prior section, if the plaintiff succeeds at step one, the burden at this point shifts to the defendant. *See, e.g., Crouch Ry. Consulting, LLC*, 610 S.W.3d at 485. Courts assess five factors in deciding whether the exercise of specific personal jurisdiction is fair: "(1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Baskin*, 676 S.W.3d at 569.

In addition to the constitutional requirements, courts also need statutory authorization to exercise personal jurisdiction. *See, e.g., Gordon*, 300 S.W.3d at 645 (noting that statutes define the outer limits of "the ability of Tennessee's courts to exercise jurisdiction over nonresident defendants"). As the Tennessee Supreme Court explained in *State v. NV Sumatra Tobacco Trading Company*, Tennessee enacted several different

"long-arm statute[s] to expand its jurisdictional reach as far as constitutionally permissible." 403 S.W.3d at 741; *see also* William A. Schramkowski, *Look Before You Leap: The Measured Approach to Analyzing Registration Statutes Under the Dormant Commerce Clause*, 48 Vt. L. Rev. 355, 374 (2024) (explaining how many states, like Tennessee as recounted in cases like *Gordon*, reacted to *International Shoe* by crafting statutes that would "legally stretch[ ] . . . personal jurisdiction capabilities to the Constitution's outer bounds"). While Tennessee's long-arm statutes contain various lists of potential reasons to hale out-of-state actors into its courts, *see, e.g.,* Tenn. Code Ann. §§ 20-2-214, -223, -225, the General Assembly has extended the reach of personal jurisdiction in Tennessee to "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. §§ 20-2-214(a)(6), -225(2); *Baskin*, 676 S.W.3d at 567 (collecting cases). Given the existence of the catch-all provision, "the inquiries under Tennessee statutory law and under relevant constitutional law collapse into one." *Baskin*, 676 S.W.3d at 567. The parties agree that the circuit court erred insofar as it focused too narrowly on particular statutory hooks for personal jurisdiction without considering the broader reach of the catch-all provision and the critical constitutional arguments. The parties have briefed the constitutional issues presented in this appeal both as to step one and step two of the issue of personal jurisdiction, and, given that personal jurisdiction motions present a question of law, we now move to analyzing the parties' arguments consistent with the principles described above. *See Baskin*, 676 S.W.3d at 566; *First Cmty. Bank, N.A.*, 489 S.W.3d at 382.

IV.

A.

Consistent with the analytical framework of the Tennessee Supreme Court, we begin by assessing Mr. McDowell and Maverick's contacts with Tennessee and the connection of these contacts, if any, with Hannah's lawsuit.

Since 2022, Maverick and Mr. McDowell have had numerous communications with various Tennessee entities including, of course, Hannah and its officers, but also the Tennessee couple that hired Hannah as its agent to build the Clareon Drive Project and at least one Tennessee-based vendor of appliances and fixtures, Ferguson Enterprises, LLC. Mr. McDowell and Maverick relied, at least in part, on materials, designs, and funding that came directly from Tennessee to complete their work. Mr. McDowell's construction contracts with Hannah are themselves "contacts" within the meaning of personal jurisdiction precedent. *See, e.g., Burger King Corp.*, 471 U.S. at 478-79 (noting that, while a contract itself cannot "alone" create personal jurisdiction, "factors" such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum").

- 12 -

The fact that the second contract listed Hannah as a Tennessee domiciliary indicates that the Defendants were keenly aware that they had contracted with a Tennessee-based company and that they would be building one of the two projects on behalf of Tennessee residents. *See Ford Motor Co.*, 592 U.S. at 359 (explaining that a plaintiff may show that "the defendant deliberately 'reached out beyond' its home—by, for example . . . entering a contractual relationship centered there" (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). Each email the Defendants received from Hannah's members had the company's Hendersonville, Tennessee, address listed in the signature block, serving as a reminder of the company's Tennessee-centric identity. *See NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 754 ("Due process requires that individuals be given 'fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.' . . . [T]he requirement of fair warning is satisfied as long as the defendant has 'purposefully directed' his or her activities at residents of the forum state . . . ." (quoting *Attea v. Eristoff*, No. M2005-02834-COA-R3-CV, 2007 WL 1462206, at *2-3 (Tenn. Ct. App. May 18, 2007))). These contacts at the very least "relate to" Hannah's current lawsuit against Maverick and Mr. McDowell. *See Ford Motor Co.*, 592 U.S. at 359.

In addition to the many contacts that are related to this lawsuit, Maverick and Mr. McDowell also made at least two contacts with Tennessee that bear a central causal connection with Hannah's lawsuit. First, they sent an invoice to Hannah that allegedly falsely represented the cost of having Mr. McDowell's own personal fence painted as an expense on the Clareon Drive Project. Thereafter, Maverick and Mr. McDowell procured, by alleged misrepresentation and fraud, $10,000 wired from Hannah's bank account in Sumner County, Tennessee. These contacts matter because "in the tort context, courts often ask whether the defendant purposefully directed its activities at the forum state." *See Baskin*, 676 S.W.3d at 568. Hannah provided the court with a sworn declaration from Mr. Pineda detailing Mr. McDowell's alleged scheme to use a Maverick invoice as a conduit to convert funds from Hannah's business account as a windfall. Assuming that all the allegations in Hannah's first amended complaint are true, Mr. McDowell and Maverick sent an invoice to Hannah's company representatives in Tennessee to steal funds, which provides further evidence of purposeful availment by directing fraudulent activities at Tennessee. Here, neither Maverick nor Mr. McDowell physically stepped foot in Tennessee. Nevertheless, it is alleged that both intentionally caused an electronic communication to cross state lines with the deliberate intent that it would be received in Tennessee and that the fraudulent communication would result in Hannah taking actions in Tennessee to relinquish funds under false pretenses, knowing that the payment of the fraudulent bill and the injury would occur in Tennessee. In that sense, Hannah's lawsuit "arises out of" these alleged tortious actions taken by Maverick and Mr. McDowell and those allegedly tortious actions were directed at Tennessee. *See First Cmty. Bank, N.A.*, 489 S.W.3d at 388.

In addition, Hannah points out that the Tennessee Supreme Court has held that a qualifying tortious injury suffered within the borders of Tennessee can create specific

- 13 -

personal jurisdiction in a tort case. In *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240, 243-44 (Tenn. 1972), the Tennessee Supreme Court found that specific personal jurisdiction existed in a case where a Delaware corporation was alleged to have placed an intentionally misleading advertisement in Tennessee about a helicopter. After the Tennessee-based aviation company bought the advertised helicopter and found it to be not airworthy, it sued the Delaware corporation for, among other things, "fraud and deceit." *Id.* at 243. Specifically, the plaintiff alleged that the Delaware corporation's statements about the helicopter's airworthiness "constituted a misrepresentation of the true facts and that, relying on the misrepresentations, [the plaintiff] was caused to suffer economic loss and injury as a result of the fraud." *Id.* at 243-44. The Tennessee Supreme Court agreed in *Jasper Aviation* that these allegations sufficed to hale the Delaware corporation into Tennessee because "even if all the tortious acts in a case were committed outside the State of Tennessee, . . . but the resulting tortious injury was sustained within the State, then the tortious acts and the injury are inseparable and jurisdiction lies in Tennessee." *Id.* at 244 (collecting cases).

The outcome in *Jasper Aviation* is not dissimilar from the United States Supreme Court's decision-making rationale in *Calder v. Jones*, 465 U.S. 783 (1984). There, the plaintiff asserted that she was "libeled in an article written and edited by petitioners in Florida" even though she was a resident of California. *Calder*, 465 U.S. at 784. The writer of the article was employed by the National Enquirer but lived in Florida, though he traveled to California for business. *Id.* at 785. The writer "did most of his research in Florida, relying on phone calls to sources in California for the information contained in the article" and also "called respondent's home and read to her husband a draft of the article so as to elicit his comments upon it." *Id.* at 785-86. The President and Editor of the Enquirer was also part of the suit and had "been to California only twice—once, on a pleasure trip, prior to the publication of the article and once after to testify in an unrelated trial." *Id.* at 786. Despite these individuals not engaging in most of the allegedly tortious behavior in California, i.e., the creation, editing, initial placement, and ultimate circulation of the harmful article, the United States Supreme Court nevertheless held that California could constitutionally exercise jurisdiction over those defendants "based on the 'effects' of their Florida conduct in California." *Id.* at 789 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)).

The Court explained that

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.

- 14 -

. . . .

> [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause injury in California.

*Id.* at 788-90 (citations and footnotes omitted); *see also Walden v. Fiore*, 571 U.S. 277, 286 (2014) (reaffirming and reiterating the *Calder* rule by stating "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum"); *accord Jasper Aviation, Inc.*, 497 S.W.2d at 244-45 ("The plaintiff's complaint makes the allegation that an out-of-state defendant misrepresented the truth concerning a certain chattel. The complaint further states that the plaintiff relied on the alleged misrepresentations and as a result thereof suffered economic loss and injury in the State of Tennessee. These allegations and statements, taken together, are sufficient to state a cause of action for misrepresentation. If there is a misrepresentation . . . then the injury from that misrepresentation occurred in Tennessee. Accordingly, . . . the action lies in Tennessee, and our Long Arm Statute confers jurisdiction upon the Tennessee courts over the non-resident defendant.").

The principles articulated in *Calder* and *Jasper Aviation* are applicable to this case, and they support concluding that Maverick and Mr. McDowell had sufficient minimum contacts with Tennessee for Tennessee to exercise specific personal jurisdiction. As was true in *Jasper Aviation*, Hannah alleges that it suffered a monetary injury worth $10,000 because of a fraudulent misrepresentation sent from an out-of-state tortfeasor intentionally into Tennessee for the sole purpose of defrauding. *See Jasper Aviation, Inc.*, 497 S.W.2d at 244-45. Mr. McDowell and Maverick assert that most of the operative conduct that underpins Hannah's lawsuit took place in Florida, but the same was true in *Calder*. Notwithstanding, the United States Supreme Court held that courts situated on the other side of the country could still exercise personal jurisdiction due to the deleterious effect the plaintiff alleged she suffered due to the *National Enquirer*'s representations. *See Calder*, 465 U.S. at 789 ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98)).

- 15 -

Though the Defendants argue otherwise, the Tennessee Supreme Court's decision in *Baskin* does not stand in opposition. The *Baskin* Court "address[ed] . . . alleged breach of contract and breach of warranty" claims and not alleged fraudulent misrepresentation or other intentional tort claims. *Baskin*, 676 S.W.3d at 559. While it is true that the plaintiff in *Baskin* suggested in the trial court that some amount of negligence had occurred, *id.* at 561, none of the plaintiff's claims in *Baskin* were intentional torts. That distinction matters because, as the Tennessee Supreme Court stated in *Baskin*, the animating principles that are at issue "in the tort context" are often different than those that exist "in the contract context." *See id.* at 568. The Tennessee Supreme Court observed in *Baskin* that

> [t]he "purposeful availment" requirement is sometimes characterized differently depending on the context. For instance, in the tort context, courts often ask whether the defendant purposefully directed its activities at the forum state, whereas in the contract context, courts often ask whether the defendant purposefully availed itself of the privilege of conducting business or consummating a transaction in the forum state. . . . The concept of purposeful availment requires the defendant *itself* to have purposefully directed activities at or availed itself of the privilege of conducting activities in the forum state.

*Baskin*, 676 S.W.3d at 568 (citation omitted). The *Baskin* Court's analysis was interwoven with the contractual nature of the matter before the court. As a representative reflection of this central fulcrum of the Tennessee Supreme Court's analysis, the *Baskin* court observed in assessing purposeful availment that

> courts must examine the totality of the facts and circumstances surrounding a contract to determine whether the defendant's contacts with the forum state will make it amenable to personal jurisdiction there. . . . [T]o determine whether a nonresident purposefully established minimum contacts with the forum state in a contract-based action, the court must examine prior negotiations, contemplated future consequences, terms of the contract, and the parties' course of dealing

*Baskin*, 676 S.W.3d at 569-70 (citations omitted).

Maverick and Mr. McDowell's contention that *Baskin* precludes personal jurisdiction under the circumstances of the present case does not account for the Tennessee Supreme Court's clear indication of a different emphasis in tort as opposed to contract when considering purposeful availment. Here, while it is true that Hannah lays groundwork for its claim to personal jurisdiction through contacts that frequently also appear in contract-based cases, such as the communication, coordination, and collaboration that was occurring in Tennessee between these parties, Hannah's lawsuit takes square aim

at the alleged fraud being directed at Tennessee. The targeted fraud is not Mr. Pineada painting in Florida but instead the allegedly false bill that was transmitted intentionally and knowingly into Tennessee, to be paid by a Tennessee company through actions occurring in Tennessee, with an injury that would occur within Tennessee's borders. *Baskin* recognizes rather than upends the understanding that considerations may vary in assessing minimum contacts in the contexts of tort and contract. A contrary understanding, embracing the contention of Maverick and Mr. McDowell, would render Tennesseans more vulnerable to acts of intentional fraud or scams purposefully and knowingly directed specifically at a Tennessean or Tennesseans with knowledge that the injury would occur in Tennessee.

Maverick and Mr. McDowell also argue that they should be treated separately for the purposes of this analysis because Mr. McDowell was simply acting as Maverick's agent for the purposes of this litigation. We fail to see why that distinction makes a difference under the facts of this case. Here, Hannah affirmatively alleged that each defendant engaged in actions that were directed into Tennessee, caused injury there, and were calculated to do so; that is enough to treat them the same for the sake of Hannah's current lawsuit. *See Jasper Aviation, Inc.*, 497 S.W.2d at 244-45. Hannah did not allege that Maverick's contacts with Tennessee were significantly broader than Mr. McDowell's or vice versa. Hannah did not allege, for example, that most of Maverick's communications came from one of Maverick's employees as opposed to Mr. McDowell. The opposite is true: based on the allegations in the complaint and the evidentiary support that Hannah presented as part of this appeal, Maverick and Mr. McDowell's contacts with Tennessee are essentially coterminous. Given their overlapping nature, this is not a case where separately analyzing Mr. McDowell and Maverick's contacts with Tennessee is necessary.

In sum, we conclude that Hannah has presented allegations that both Maverick and Mr. McDowell established sufficient minimum contacts with the State of Tennessee, and these allegations do not plainly lack credibility. *See NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 735, 741-42. Hannah presented multiple volumes of exhibits that illustrate how its lawsuit "arises out of" and "relates to" these contacts in various ways. *See Ford Motor Co.*, 592 U.S. at 359; *First Cmty. Bank, N.A.*, 489 S.W.3d at 388. Moreover, Hannah asserted that Maverick and Mr. McDowell directed their allegedly tortious conduct at Tennessee and intentionally caused tortious injury to Hannah in Tennessee. *See, e.g., Jasper Aviation, Inc.*, 497 S.W.2d at 244-45. Accordingly, Hannah carried its burden at the first step of the personal jurisdiction analysis.

B.

We next consider whether it would be otherwise fair and reasonable to hale Maverick and Mr. McDowell into a Tennessee court. As noted above, because Hannah satisfied its burden at the first step, the burden of proving that exercising personal jurisdiction would be unreasonable or unfair shifts to Maverick and Mr. McDowell. *See*

- 17 -

*Crouch Ry. Consulting, LLC*, 610 S.W.3d at 485; *NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 752; *Gordon*, 300 S.W.3d at 647. We evaluate whether Maverick and Mr. McDowell met their burden by considering the five fairness factors referenced most recently by the Tennessee Supreme Court in *Baskin*, namely: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. 676 S.W.3d at 569.

First, the burden associated with defending against Hannah's Tennessee lawsuit is not particularly unwieldy. As the United States Supreme Court has explained, "because 'modern transportation and communications have made it much less burdensome for a party to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King Corp.*, 471 U.S. at 474 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "[T]he limited record before us" illuminates "no special or unusual burden" that Maverick and Mr. McDowell might face by answering for their alleged torts in Tennessee that is separate and apart from the general costs of litigating a lawsuit in any forum. *See Crouch Ry. Consulting, LLC*, 610 S.W.3d at 486. The only reason Maverick and Mr. McDowell supply in their briefing that appears to touch on this factor is that relevant witnesses would need to travel from Florida to Tennessee to testify. However, Hannah already demonstrated a willingness to pay for Mr. Pineda to travel to Tennessee for the purposes of testifying. Moreover, considering the volumes of evidence already presented in the record for this appeal, the court struggles to understand what additional materials would be needed to defend against Hannah's lawsuit. Neither defendant has identified any in their briefing, nor have they suggested that those materials would be any more difficult to obtain in Tennessee than in Florida.

Concerning the second and third factors, which are interrelated, "we do not doubt that [Hannah] has a substantial interest in obtaining relief in Tennessee, and Tennessee has a corresponding manifest interest in providing residents with a convenient forum for redressing injuries [allegedly] inflicted by out-of-state actors." *See Crouch Ry. Consulting, LLC*, 610 S.W.3d at 486. "An individual injured in [Tennessee] need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause injury in [Tennessee]." *See Calder*, 465 U.S. at 790. Mr. McDowell and Maverick have not presented an argument that Tennessee has no interest in this suit, nor could they plausibly have done so under existing precedent.

Finally, the fourth and fifth factors consider the potential effects that exercising jurisdiction in Tennessee may have on the broader system. As was true in *Crouch*, the Defendants here have not presented any evidence "that weighs heavily in one direction or the other." *Crouch Ry. Consulting, LLC*, 610 S.W.3d at 486. The main argument that Mr. McDowell and Maverick present to counter this reasoning is their belief that Florida has a

much stronger interest in this litigation than Tennessee.[4]  They assume, rather than demonstrate, that "Florida law would apply" if this case were allowed to proceed forward, without taking any time to consider Tennessee's choice of law rules.  Because the Defendants have not briefed the horizontal choice of law question, it is not clear whether their suggestion would ultimately prove true.  *See generally Hataway v. McKinley*, 830 S.W.2d 53 (Tenn. 1992) (explaining Tennessee's approach to determining which state's substantive law governs a suit involving nonresidents); *Wayland v. Peters*, No. 03A01-9705-CV-00172, 1997 WL 776338, at *2 (Tenn. Ct. App. Dec. 17, 1997) (applying *Hataway* and noting that, under Section Six of the Restatement Second of Conflicts, the "place of injury" is an important consideration for choosing which state's substantive law will apply to a particular lawsuit).  We also do not comment on Florida's potential interest in this lawsuit, except insofar as we note that it does not make an outcome-determinative impact on the question of whether it would be constitutional for *Tennessee* to exercise personal jurisdiction in this case.  *See, e.g., Burger King Corp.*, 471 U.S. at 483 ("Moreover, although Rudzewicz has argued at some length that Michigan's Franchise Investment Law . . . governs many aspects of this franchise relationship, he has not demonstrated how Michigan's acknowledged interest might possibly render jurisdiction in Florida *unconstitutional*.").  In the event of a substantive legal conflict between Tennessee and Florida law—which the Defendants have not identified—Tennessee's choice of law rules will help the trial court navigate that conflict.  *See id.* at 477 (emphasizing the role of conflict of law rules in navigating potential clashes between state substantive policies and explaining that the existence of such rules allows courts to stop "short of finding jurisdiction unconstitutional").

Based on the analysis above, we agree with Hannah that the five factors related to fairness each suggest that exercising specific personal jurisdiction over Mr. McDowell and Maverick would not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The Defendants have not carried their burden of demonstrating that exercising personal jurisdiction here would be unfair or unreasonable.  *See Crouch Ry. Consulting, LLC*, 610 S.W.3d at 485.

Based on our evaluation of Hannah's first amended complaint and its accompanying materials, we conclude that Maverick and Mr. McDowell created sufficient minimum contacts with the State of Tennessee to demonstrate purposeful availment and that Hannah's lawsuit arises out of or relates to those contacts.  We also conclude that Maverick and Mr. McDowell did not carry their burden of demonstrating that holding them accountable for their alleged wrongdoing in Tennessee courts would be unfair, unreasonable, and inconsistent with the Fourteenth Amendment to the United States

---

[4] While the Defendants also cite a Florida statute that purports to invalidate venue clauses in construction contracts, *see* Fla. Stat. § 47.025, the construction contracts in this case contain no such provisions.

Constitution.  Insofar as the trial court concluded that specific personal jurisdiction did not exist in this case, we reverse its decision.[5]

V.

In considering the arguments advanced on appeal and for the reasons discussed above, we reverse the judgment of the trial court.  The costs of the appeal are taxed to the appellees, Maverick General Contractors, LLC, and Brent McDowell, for which execution may issue if necessary.  The case is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman<br>
JEFFREY USMAN, JUDGE

---

[5] The trial court did not rule upon Maverick's and Mr. McDowell's *forum non conveniens* argument nor did they renew that argument in this court.  While *forum non conveniens* and the fairness inquiry outlined in cases like *Crouch* touch on similar themes, they are distinct concepts.  As noted in an earlier footnote, the doctrine of *forum non conveniens* is meant to be relied upon where personal jurisdiction exists. *See, e.g., Luna*, 208 S.W.3d at 405 (explaining that the doctrine allows a court to discretionarily "decline to exercise a *possessed* jurisdiction whenever, because of varying factors, it appears the controversy may be more suitably or conveniently tried elsewhere") (emphasis added); *see also Zurick v. Inman*, 426 S.W.2d 767, 772 (Tenn. 1968) (explaining that the application of *forum non conveniens* "presupposes the court has jurisdiction of both the parties and the subject-matter").  Additionally, whereas the second step of the personal jurisdiction analysis is tied to a constitutional requirement of due process, *Crouch Ry. Consulting, LLC*, 610 S.W.3d at 485, *forum non conveniens* claims are instead judged by assessing "various private and public factors" that are considerably more expansive and differently articulated than the fairness factors germane to the personal jurisdiction analysis.  *Luna*, 208 S.W.3d at 406; *compare In re Bridgestone/Firestone*, 138 S.W.3d 202, 207 (Tenn. Ct. App. 2003) (tying relevant considerations in *forum non conveniens* context to the United States Supreme Court's decision in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)), *with Crouch Ry. Consulting, LLC*, 610 S.W.3d at 485 (tying examination of fairness factors for personal jurisdiction challenges to *Burger King Corp.*, 471 U.S. at 474).  Those unique public and private considerations in the *forum non conveniens* context include but are not limited to access to proof, availability of process, cost, potential to examine physical premises if appropriate, enforceability of judgments, administrative difficulties, jury considerations, and media concern.  *In re Bridgestone/Firestone*, 138 S.W.3d at 207-08 (citing *Zurick*, 426 S.W.2d at 772).  Because the trial court concluded that Tennessee courts lacked personal jurisdiction over the Defendants as to this suit and pretermitted any discussion of the *forum non conveniens* doctrine, the Defendants had no occasion to renew that defense in this appeal.  Accordingly, we do not opine on the merits of that potential future issue and leave any further discussion of *forum non conveniens* for the trial court to potentially consider in the first instance on remand.

Additionally, this opinion should not be construed to decide the outcome of any future horizontal choice of law dispute concerning whether the substantive law of Tennessee or Florida should govern this lawsuit, as we have not had the benefit of briefing from the parties on that question.  This court's sole decision here is that Hannah correctly reasoned that the trial court erred in concluding that Tennessee lacked personal jurisdiction over Maverick and Mr. McDowell.